You might wonder why the boss over here is not in the middle, and the reason is she has laryngitis. So if she has a question today, and I'm sure she'll have one or two or three or four, she's going to like that and whisper, but bear with us. Both Judge Rendell and I welcome Judge Michael Belson of the United States District Court for the Eastern District of Pennsylvania being with us today. He's argued, as I recall, before us many times in the past, and this will be my first of three times with him this week. I think we'll be together tomorrow, and then we're going to be jointly doing a wedding on Saturday. So it's a small world. We'll announce the first case, number 05-5259. It's Pennsylvania Family Institute, Inc., et al. versus Thomas C. Black III, et al. Messrs. Bopp and Donaldson. Thank you, Your Honor. I'd like to reserve five minutes for rebuttal. You certainly may. And I'm sorry it wasn't at the table. I looked at the list yesterday, and it was the fourth listed, and I didn't check. Okay. I'm sorry. I'm glad you're here. Okay. Thank you. But if not, we could have put you last. It's not a problem. No problem at all. Thank you very much. In 2002, the United States Supreme Court held in the Republican Party in Minnesota versus White that the First Amendment protects the right of judicial candidates to announce their views on disputed legal and political issues. The question, I guess, for us here, and it's going to be, you're going to get a lot of questions on this one, standing, third-party standing in this particular case. Why didn't, did you attempt to find any candidate who would be willing to be a plaintiff in the case? I think the plaintiff did, did, and found no one willing to confront the disciplinary authorities in this state. What about – go ahead. Is that a matter of record? No. That you tried and could not find someone? No. Because we couldn't find anything in the record. No. There was nothing in the record on that point. When you say third-party standing, Your Honor, we are first claiming our own rights. As a listener. Yes, as a listener first. Secondly, as a speaker. That is, as a listener, we have the right to receive speech, and if it is chilled, that is, the speech of another person is chilled, and therefore refuses to give speech that would otherwise be given, then our rights as a listener is violated. Just for the sake of laying it out and organizing it, let's start with you as a listener first. Okay. Well, we are claiming that the judicial candidates are chilled by the existence of the plain language of these canons. That is, that the canons are vague and overbroad, and in fact, five different district courts, and one agreed to by the Sixth Circuit, has struck down these identical canons on those identical grounds. Mr. Bout, do you agree that for you to have standing as a listener, that you have to have a willing speaker established in the record? Yes. Do you believe you have had a willing speaker? Judge Rambos said you did not. Well, Judge Rambos, yes, we believe we have, and Judge Rambos used the wrong standard. She said but for. The standard in this circuit is not but for the canons. The standard, as articulated in AIELLO v. City of Wilmington in 1980, is that an impermersible chill is created when one is deterred from engaging in the potential, in the protected activity by the existence of a government regulation or the threat of prosecution under that. And so it's not a but for standard. Although the AIELLO case was, I think, a little bit different. Well, it was different, but it announced the rule, and the rule is not but for. The rule is you are deterred. In other words, you are influenced. But don't you have to show that somebody was deterred? I mean, if you don't, Judge Rendell's my question at the outset. If you don't have someone that said he or she was deterred, what evidence is there in the record that you have somebody willing to speak, but their speech was there was an obstacle to it or they were chilled or what? Well, we have a verified complaint, which we rested upon in the preliminary injunction hearing that sets out the facts that we rely upon. Those facts include the answers of judicial candidates, 18 of which submitted the pertinent questionnaire back to the Family Institute, 14 of which refused to answer one or more questions by saying they refused to answer. And then at the bottom of each page is an asterisk to indicate what that means, that refuse to answer means. And it says this response indicates Mr. Bob, for one second, we're going to have to. I'm sorry. You can read it, but they don't say I am doing this because of the regulation. But deterrence means that there is at least a causal relationship, isn't it? Deterrence. Well, I think there is a causal relationship. You have people that do answer some of these questions. So they are certainly indicating a willingness to answer the questions. Of those 14, almost all of them answered at least one question. Some answered a number of questions but declined to answer other questions. Well, the ones who did answer the questions may not help you with regard to when you are a speaker. But in connection with being a listener, the question, it really, there's got to be somebody out there that says, doggone it, I was willing to say something, but I was chilled by it. And but no one came forward. Well, they submitted the answers to the questionnaire where they said they declined to respond because they think that they are prohibited from answering the question by the canon. Although that was a canned, that was not canned, excuse me. That was a supplied response to them. Well, yes, but they didn't have to use it. They are lawyers and judges after all. These are ignorant lay people. The word because is not in that footnote. That's right, because the requirement under a chill is not a but-for requirement. It is you are deterred. And surely everyone would agree that a judge that believes that a canon prohibits certain activity is certainly deterred. Now, and finally, there's one I want you to draw your particular attention to, and that's found at the appendix 109. And the answer to number five, he circled declined to answer and then put in the margin next to that answer. This could come before the court. Well, what does that phrase mean? Well, that phrase is in the canon, in the commits clause. But it also could be that the person, did this person testify at the hearing? No. I mean, it could just as easily be that the person has a belief that I should not be commenting on something that may come before me. Then he could have said that. May I ask? It's easy to say. Procedural question. Was there any testimony taken at the hearing trial? It was a combined hearing and trial. Did your side try to present any evidence? No. Is there any reason why not? Well, it was a preliminary injunction. But it was consolidated for final hearing and trial. Is that correct? Very true. So you could have called witnesses. We could have, yes. But you put no evidence on whatsoever. We put the verified complaint, which contains the answers to the question. With the exhibits. The exhibits. And then you rested. And we rested. On that evidence, yes. But you could have called judges or you could have called members of your organization who could have testified to different facts and elaborated on the allegations in the complaint. Well, potentially. But understand, this is initially a preliminary injunction hearing. This is a hurry-up situation. We had done everything that we could by contacting the disciplinary authorities to tell them, to ask them to relieve the concerns that these judges had expressed by disavowing any intention to enforce these canons against people answering the questionnaire. And they refused. Did you subpoena any of the defendants to appear and call them as adverse witnesses? No. No. It was a preliminary injunction hearing. These are traditional. Well, it wasn't just a preliminary. You had agreed that it would be combined preliminary injunction hearing and trial. Isn't that correct? Yes, they said that. But, I mean, the context is a hurry-up situation right before an election in which the court was expeditiously handling these things. So we felt that under precedent of the Third Circuit, where you say all it requires is being deterred, then that is sufficient. And I think this case is very similar to the Focus case decided by this court in 1996 and very similar to the Pitt News decided by this court in 2000. How is it similar to Focus where it found there you didn't even have case or controversy jurisdiction? Oh, the court found in Focus Article III standing. You're correct. Yes. And it was based on listener. But Focus does say that the willing speaker's requirement is jurisdictional, does it not? Well, yes. Yes, I've agreed to that, certainly. And we've repeatedly agreed to that. There's no question about that. The question is, what is the standard for determining it? In the Focus case, the gagged people, A, did not oppose the gag, so they didn't come forward. Hang on for a second. Once you have five more minutes on, please. Thank you. So there was no gagged person like a judicial candidate that came forward. Secondly is that they expressed fear with respect to asserting their rights. So I think we have that here. I mean, there's some trepidation by judicial candidates and judges to sue the judicial disciplinary people. And furthermore, there's an election going on, which could create issues in the election. So there's reasons or fear, justifiable fears, why a judicial candidate would not come forward. And finally, these gagged people, while not saying what the listener wanted to hear, did talk about their experience in court. Again, the court said, indicating a willingness to speak if not deterred. Well, we have people that have partially answered this questionnaire. So if you look at the key elements, there's nothing in Focus about but for. There's nothing in Focus about subpoenaing these gagged people and having them say, well, yes, I would speak if this gag order was not there. In Pitt News in 2000, we had alcohol advertising in an educational publication was banned. The newspaper sued. And the injury was lost revenue. Here is lost speech. It is, quote, fairly traceable, not but for, fairly traceable to the law. That is, the law prohibited the advertising. And finally, it's not merely speculative that the newspaper would receive advertising. These people, the court explains, went off and are conveying these messages in other ways. So, again, all those standards, and that isn't even a First Amendment case. Where this court has explained that the First Amendment rights that are at stake here mean that we need to view these things with some degree of sympathy. Now, the other equally important. Before we get to the you as speaker, in terms of third-party standing, might you at least discuss a bit the Munson decision? If you remind me of the factual context, I'm sorry. Well, Munson is a Supreme Court case. And if you're not aware of it. Well, I am aware of it. I just do not recall the factual context. As to third-party standing? Well, we're not asserting third-party standing. We're not at all? No. We are not claiming that we have terse jurisdiction standing. We are not making that claim. Can you complain it's not there? No. Okay. Ms. Red. Well, if it's inartfully drafted, I can assure you. So basically what you're saying is our decision, we don't have to look to our decision in the motto to give the parameters of third-party standing. That's correct. Because we're not asserting it. We're not claiming it. We're not claiming the ability to assert the rights of judicial candidates. We are saying, one, we have our own right, which is to receive their speech. And if their speech is restrained or deterred and they are chilled, then it's a violation of our right to receive it. The right to receive speech is independent of the right of one to speak. Now, other than you have to have somebody willing to speak. We're not claiming the rights of judicial candidates. Well, then why don't you go to the speaker part of the argument? Yes. We also claim our own right is chilled. But in that context, you did have people who were willing to give their, to speak for themselves. Yes. And you're saying, but when they gave those to you, what makes you reticent about publishing it when they don't seem to be concerned about your publishing their responses to the survey? Because we don't want them to be disciplined or removed from office. But they don't, isn't that really their call, not yours? Well, you know, somebody standing on a bridge, you don't, you know, push them over. Sometimes you actually go grab them and rescue them. So we have an interest in people who answer our questionnaires not to be disciplined. But their perception would be that if, to use your analogy, they're standing on a bridge, it isn't very high. If they go in, they're not going to get hurt. And they're not worried about the consequences of higher authorities because they, in effect, are simpatico with your position on this whole matter. And we don't, and, you know, I don't know why they answer. They may not be aware of the canons. I mean, there's hundreds of judges, and 18 of them submitted answers. But we do not want judges who answer our questionnaires. There's, what, about 118 judges or so here? Yes. We don't want them to be disciplined. And so we didn't publish their response. And this case, these facts are identical to the decision of the Indiana Federal District Court just a few weeks ago who found that that is suitable for standing. But doesn't this get into the issue of rightness that Judge Rambo also found? That if you had called some of these people as witnesses or established that they would have been disciplined, then the record might support you. But all you have here is a bare allegation, and she said that was speculative. Well, no, I don't think she said it was speculative. I think she said it wasn't right because there was no interpretation. And that, again, ignores precedent of this circuit and the Supreme Court that held that the mere existence of a statute is sufficient to have a prospect of the enforcement of the statute. And certainly this canon appears to commit with respect to an issue is certainly vague and broad enough to encompass questions about the legal and political issues that a court might face. So, again, I think she just used the wrong standard in making the determination. She did not pay attention to the fact that the mere existence of the statute itself, which this court has said several times and the Supreme Court, is sufficient to create the chill. You do not have to have some interpretation of the matter. I see my time is up. Can I ask why you did not assert third-party standing? Well, I don't think we have it. I don't think we have the close relationship that is required by the three-part test. So we have not done so. And I'm sorry if you thought otherwise. Well, the complaint asserted the rights of the candidates, but you're saying merely because they are necessary for your rights. Exactly. As a listener. Thank you. Thank you. Mr. Donaldson? May it please the Court, Your Honors, my name is David M. Donaldson. I am counsel from the Pennsylvania Supreme Court's administrative office, and I represent the defendants who are the officials on the Pennsylvania Judicial Conduct Board and the Attorney Disciplinary Board. Your Honors, I do have several things that I wanted to say before my time is up this morning. I also would like to take a moment on the lack of a final order issue. But quite frankly, given the tenor of the Court's questioning, I want to actually open myself up to questioning as much as possible. That is not to say that I don't have several things that I want to say, but I don't want to belabor points that aren't necessary. For example, I find it very troubling, and that's been part of the problem with this case. It's been a little bit of a dodging and weaving target. It was argued below, and it was tried below as a third-party standing case. As you know, and I can see why Judge Rendell was, maybe I'm overstating, misled. We both, we all talk about third-party standing a lot. Can I right now pull out in the complaint where it talks about third-party standing? No, but I can do that in my opponent's brief. So I would ask that we all, when we go back and look at this case, not so quickly say that it's not a third-party standing case. But if he's conceding that it's not, there's no reason for me to address that part of the issue. When candidates responded substantively to this survey, did they violate the canons? No, absolutely not. And in fact— Because of white, and you're saying that— And I think the distinctions and the timing of this case are remarkable. Here we are, December 4, 2006. We're virtually on the eve of what promises to be a very active judicial campaign in the Commonwealth of Pennsylvania. There are two open seats for the Pennsylvania Supreme Court in the primary, and then again, of course, two open seats in the general election in the fall. And there's one retention election in the fall. We are going to have candidates making statements, and we are going to have my clients having to face what I can never get them to face, the reality that these canons are becoming very advisory because of the history of no complaints, no enforcement, not the semblance of enforcement under these types of canons. Judge Bailson hits the nail right on the head. We don't have a motion to dismiss case. We're not talking about focus. Focus was my case. I lost because it was on a motion to dismiss, and I was sent back so that the plaintiffs could prove that they did have standing, not the merits of the case, so they could prove they had standing. We settled that case. They proved nothing here. They had no witnesses. They could have subpoenaed my clients to at least get a statement for some semblance of ripeness. So for them as listener, you're saying that they did not prove that there was a willing speaker. Is that correct? Exactly. They proved no injury to themselves at all. In fact, the only injury that they proved was the injury they caused themselves, perhaps. They had four candidates who completely answered the questionnaires, boldly, forthrightly. Other judges looked at that and said, well, gee. Although only four out of whatever, 115 or 118, whatever the number was. Only 18 returned the questionnaires. So you have 100 who didn't. Exactly. And it could be any reason from, I don't engage in this type of thing. I want to educate the public as to what a judge does. A judge does not primarily do the will of the people, as we heard senators and congressmen talk about last fall. What a judge does, to the extent of the will of the people, is through the rule of law. As Justice Breyer said recently in the Georgetown Judicial Independence Conference, our goal is to have the judiciary be the least political of the three branches of government. He admits that it's not apolitical. It can't be. It's operating in a democracy. But the goal is to be the least political. Judges have lots of reasons for making statements that they make and for refraining from making statements. As your honors know, when you went through your confirmation processes and when you attend conferences, you don't look to the minutia of canons and what the so-called experts tell you the canons. What you do is you look at your experience with the way in which you decide cases and you make a judicial decision based on your discretion as to what's appropriate and what's not. And I think you're careful, like I would want you to be in this case. Does the standard of deterrence versus but-for tip the balance here? It does not, your honor. I submit two things on the but-for. Given the total lack of factual record in this case, we don't need the but-for standard. We don't have anything of record as to why a candidate did or did not answer. In fact, for completely did. And I don't understand how a plaintiff can claim injury when they refrain from publishing as a speaker or receiving information and publishing it as a receiver of speech. They made that decision. And I want to go to Judge Baleson's 2005 decision in the, I believe it was the Bass v. Butler case. He talks about the Laird v. Tatum, which goes back, I believe, to when even I was still in law school. And it talks about objective rightness for injury for standing purposes in an overbred case. When I did the briefs— That case is on appeal, I think, so who knows what will happen. I actually think that that's on appeal on several issues, your honor. And I think your rightness holding on that is exactly the case law today. Today, you do not say, I've brought an overbred case, therefore rightness is relaxed. As you point out, no. That's standing. And that's third-party standing. Rightness has to be objective. It can't be a subjective chill. What could be more subjective than plaintiffs coming into court who were narrow in interest— But we don't reach rightness if we don't get past standing, do we? Which is why I spent probably seven-eighths of my brief on standing. And then when I started to prepare for oral argument, I realized how strong the rightness arguments were, but felt uncomfortable relying on rightness because it seemed standing was so important, so constitutional. But Judge Bailson's opinion, basically, I think what it does is it shows how rightness and standing is the heading. And rightness can very much be a subset. Who brings the lawsuit as standing? When they bring it as rightness? That sounds like it's completely different things. But in reality, they start to become the same thing when you have plaintiffs saying, we bring the lawsuit because we've decided this is chilling to our judges, as they say in the record. If this were a third-party case, or I mean if this were the judicial candidates themselves as plaintiffs, would it be ripe? Wasn't that the context in White where a candidate said I need a declaratory judgment? It could be given what kind of ‑‑ depending on what kind of record. And I looked at the district court cases, all of which, including the Indiana case and the Kentucky case, were very ripe. What you had there ‑‑ But it's Mr. Donaldson's vote. You had several things there. You had candidates making very specific statements and then showing or saying, I have a memo from the disciplinary people. I have an advisory opinion from the disciplinary people telling me what I can say and what I cannot say. And what I've just said here appears to violate that. And I have a history of them pursuing these interests. They took the opportunity of the White case to reinforce their canons. What we have in Pennsylvania, rightly or wrongly, is a completely inert system. We have candidates who have no advice, no memos, no semblance of enforcement. But you do have candidates here who did circle the declined answer box that had the asterisk saying, the reason I declined to answer is because of the canons. So isn't that evidence in and of itself that these people are not willing to speak because of the canons? I think a few questions of a witness may have revealed whether the answer to that question is yes or no. As I say, I think there could be a lot of reasons. They could be using it as easy cover rather than doing the more difficult thing. And I think it's what we're all who represent the judiciary trying to do now, to educate the public as to how, yes, we do elect judges. Yes, it's part of democracy. It's part of the political process. But there's something fundamentally different about the way judges make law from the way the legislature makes law and the way the executive enforces that. And I think that's a hard task, but it probably needs to go back to civics in high school, in grade school, where we say, no, what judges do is they maintain the most open mind possible. No one wants, I don't believe, anyone wants to go before a judge that's already committed, pledged, or promised. Contract language. I don't want to get into the merits too far, but I can't resist. I find it very troubling that the district courts that very quickly just knock down these canons under White don't even take the invitation in Justice Scalia's opinion to look at the dictionary definition between announce, which is about as general as you can get. Although I have an opinion. I mean, at this point, I mean, White is the law. White is definitely the law, and announce is out of the Pennsylvania canons, and as far as I know, it's out of all the canons. Now we're talking pledge, promise, commit. And the judges and judicial candidates may have looked at that and had some questions, and I think that's part of the problem with ripeness, and we're going to see things ripen this year. We're going to have a debate alongside with the rest of the country, because not to put too much pressure on myself, but to put the pressure on the court, this case is not operating in a vacuum. This case is being watched across the country, and it's being watched for one very specific thing. How little can a narrow advocacy group present to get standing, to get ripeness, to knock down these canons? Do they, as Judge Bailson said, have to present something? Question one of my questions. Ask one of the people that were resistant to get them on the stand under protection. Or even if the footnote said, I am declining to answer because, the footnote doesn't say that. It says I am prohibited. It doesn't say that's the reason. And not to be too flip, it's a very glib, transparent trap. It's very manufactured. These issues aren't that simple. When you ask a judge a complicated question, very often what they'll come back to you with is five or six questions to try to hone in on exactly what are you asking them, what are you talking about. In the context of being able to question judges, most of us are never in a position to be questioning judges. May I, unless your honors don't want me to address it at all because it is in the briefs, just take a couple moments on the final appealable order issue. Go right ahead. Because I think it really goes to the heart of this case and what happened here, the quickness of it. Two things. I want to bring in one of Judge Ambrose's opinions where he wrestles with the issue of administrative closing of a file versus dismissal without prejudice. And the local rule in the middle district which says give notice to the judge that you've appealed. Well, I scoured the record and I couldn't find anywhere where they gave Judge Rambo notice that they appealed. And now they're saying in their reply brief that I don't have to. That case that I wrote was whether you needed to comply, what you had to do to comply with Rule 58 in order to have an appealable order as an administrative matter. Very, very different context. However, I think the reasoning is the same in that when a court dismisses the case without prejudice, even when I was inexperienced, that said something to me. That told me to go back and look at it. Man, what could I do? What could I do to make this with prejudice? Well, they filed a notice of appeal in the district court. So isn't that notice to the judge? They did, and that's certainly part of the rules. But there is a very specific, and quite frankly, candidly, I trip up on middle district rules regularly because there are so many of them. So it's ironic that I would get up and talk about a middle district rule. But I have learned that the reason for that rule is exactly this. So that a judge could say, well, it says administrative closing, but it's a dismissal without prejudice. I assumed your people were going to amend. They candidly admitted in their reply brief they don't want to amend. They never wanted to amend. Maybe Judge Rambo made a mistake in saying it was without prejudice because it's after a trial. How could it be without prejudice after a trial? Well, because they could very easily amend their complaint at that point and they'd have a brand-new controversy. But they didn't. They didn't. And under the Third Circuit's case law, and not to belabor the point, the dismissal without prejudice is not a final order unless two things. Unless they cannot amend, which certainly wasn't the case here. They said they could, but they didn't want to. Or they officially notify the district court they wish to stand on their complaint, which is probably one of the many reasons why there's a middle district rule. So the district court is totally in charge of is this case over or is there something more to do. Had you found an answer to the complaint? No. No, everything came up within a day and a half. We went up and I think I got the case one day, was up on a TR the next. Judge Rambo specifically had us come back to Harrisburg for the presentation of testimony and was a bit taken aback by the fact that what we really did was we argued the case, since it was a consolidated preliminary injunction, permanent injunction. What the plaintiffs have done in this situation is they've completely manufactured a case, injured themselves, said that's the injury that they have for standing, and then they determined that there was an objective chill. I submit, and my time is virtually up, this issue is so important to the judiciary. Nothing could be more important to the judicial candidates and judges than their own First Amendment rights. Narrow special interest groups did not adequately represent their interests, did not have an identity of interest. And in my experience as a litigation attorney for and against the judiciary, judges in Pennsylvania have never been shy about advancing their own important interests. Thank you very much. Thank you, Your Honor. Mr. Bobb. I know my time is virtually up, and I thank you for allowing me to return. You still have five minutes, that's fine. Well, thank you. I won't need that much. Your opening question to the commission was, would a judicial candidate be subject to these candidates if they answered the questionnaire? Their answer is no. As far as I'm concerned, that resolves this case. This is no longer a case of controversy. But I want you to know that that's the very first time that they have responded to that question. They refused. I think we were right about it, four minutes. But, Mr. Bobb, the question I was going to ask you before the lights went out on me, which probably was an indication to me, is you're claiming that the statement by co-counsel that this is not a violation of canons, it solves the case. Well, it may in terms of the merits for a future matter, but for this particular case, you've got to have standing to get there. And so we still come back to whether you have standing. Well, under the decision of this court in Presbyteria of New Jersey, and I know I didn't pronounce that correctly, of New Jersey in 1994, this court relied upon a disavowal by one of the enforcing party of the statute. As to the enforceability of the statute in a particular context, that is a context in that case of churches, and relied upon that, I think, under judicial estoppel theory, that it binds them, and therefore found no standing to challenge the underlying statute. I think we are now, regrettably, we've had to come this far to get this statement. The district court asked the commission this very thing. Go ahead. If you want to dismiss the case, you could do so. Yes, I understand, and we will consider doing that promptly. Your brief argues third-party standing in Munson. Are you conceding that the relationship would be such that you would not have third-party standing? That is my view, and that's why we have not argued third-party standing. Well, you did argue it in your brief. Okay. You cited Munson. Well, I agree we cited Munson. I didn't think it was for that particular proposition. I'm sorry. There was no first-party standing issue in Munson. Well, but there's other language in Munson that might be applicable to various issues that are being questioned here. But back to my initial point is that the concession that has been made, it seems to me under that case, the case from New Jersey that I just cited, does mean that there's apparently a Third Circuit recognizes judicial estoppel, so they're bound, and means we do not have standing to challenge. Judicial estoppel? Yes. That's in a later case. How are they judicially estoppel? Well, in a later case, well, there's nothing to them. Then you can take advantage of that, but that doesn't dictate what we do. That's sort of the next case. Well, but my point is they're disavowal of enforcing the canon against this questionnaire and the facts in this case. I think under the New Jersey case, it means we do not have standing. For us not to be pundits, we've got to have jurisdiction. And to have jurisdiction, you've got to have standing. I just conceded we don't have standing with that disavowal. You don't have any standing, even as a speaker or as a listener? Under that disavowal, I do not think we have standing under either theory, under that case, under the decision of that case. So contrary to what you said in your opening, you're saying that as a listener, you don't have standing? Yes, because it's not an evocative chill because they have now disavowed. Their disavowal, which just happened a couple minutes ago, never happened in the history of this case, despite them being asked over and over again on whether or not, including by the district court judge, whether they would enforce these canons against people that answered this questionnaire. They have now answered it. But it would seem that you ought to be pretty happy. I am happy. I am happy. I'm conceding. Until you dismiss the case, we have a case before us. And I'm just saying that if we don't do that, in my view, I'm being candid with the court. I'm not trying to say we should continue this case. I think under that decision, the disavowal… Are you saying that basically you're going to make a decision to dismiss the appeal? I've learned a long time ago not to make decisions like that at the spur of the moment. That's exactly right. But I will very soon. That's exactly why we're very… I will very soon make that decision. May I have 15 seconds? When he's done, I'll give you some time. So I just view under your precedent their disavowal as meaning that we do not have standing under either theory because there's no objective chill in the face of the disavowal. All right. I have nothing further. Thank you. Although it's not normal, Mr. Donaldson, we're going to give you your 15 seconds. May it please the Court, I've lost track of whether it was Judge Baleson or Judge Amber that asked me that question. I did. I didn't disavow anything. My question to you is when the candidates responded substantively to the survey, did they violate the canons? In other words, the four that answered. I guess now that I see that my statement and my answer to that question is the commission's disavowal, I have to say I don't know that I'm in the position to make that decision based on what we've got in front of us. My opinion, and that's – I guess that's exactly – I didn't see anything in the questionnaires or the answers that was a problem in terms of the way I saw my people violate the canons. But to disavow – Your answer was they did not violate the canons, and you thought that they did not in light of White, because I followed up with saying that – are you saying that as – Well, I don't believe – But you're saying at this point it's a personal view. I don't believe they violated the canons, and I think probably there would be others that share that. But is the commission authorized to go forward and pursue the canons? Yes. They haven't disavowed. I mean, I shrink at any thought that I disavowed the whole case. All right. Thank you very much. I really appreciate both counsel. This is a fascinating case with a lot of nuances. What I would ask counsel is to approach the clerk's office afterwards to obtain a transcript of today's oral argument. Appreciate both of you being here, and again, a well-argued case. Thank you.